FILED

JUL 3 1 2007
7-31-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED AIR LINES, INC<br>RETIREMENT AND WELFARE<br>ADMINISTRATION COMMITTEE, | ) ) ) ) | **07CV4289<br>JUDGE DARRAH<br>MAGISTRATE JUDGE NOLAN** |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. |
| WILLIAM VAN SLYCK, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, UNITED AIR LINES, INC. RETIREMENT AND WELFARE ADMINISTRATION COMMITTEE[1], by its attorneys, SEYFARTH SHAW LLP, hereby submits its Complaint against the Defendant, WILLIAM VAN SLYCK, and states as follows in support:

### Jurisdiction and Venue

1.    This action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001-1461. Therefore, jurisdiction of the court is based upon the ERISA; and in particular, 29 U.S.C. §§1132(e)(1), 1132(f), 1132(a)(3). Those provisions give the district courts jurisdiction to hear civil actions brought by the fiduciary to obtain appropriate equitable relief to enforce any provisions of the terms of an employee welfare benefits plan. In addition, this action may be brought before this court pursuant to 28 U.S.C. §1331, which gives the district court jurisdiction over actions that arise under the laws of the United States, and 29

---

[1] United Airlines Lines, Inc. Retirement and Welfare Administration Committee ("RAWAC") is the second successor to the United Air Lines, Inc. Pension and Welfare Plans Administration Committee ("PAWPAC"). *See* Exhibit A, Consent of the Board of Directors.

U.S.C. § 1367, which provides the court with supplemental jurisdiction, if necessary, over Count II..

    2.      Venue is proper in the Northern District of Illinois. 29 U.S.C. §1132(e)(2), 28 U.S.C. §1391.

## Nature of the Action

    3.      This is an action by United Air Lines, Inc. Retirement and Welfare Administration Committee ("RAWAC") for equitable relief pursuant to 29 U.S.C. §1132(a)(3) and unjust enrichment under the federal common law of ERISA.

    4.      The Plan paid long-term disability benefits to Defendant in the total amount of $8,011.00 per month from November 1, 2002 through November 20, 2004 and $8,010.00 per month from December 1, 2004 until August 31, 2005. However, the Plan documents provide a provision for offset of disability payments by certain retirement benefits' plans. At the same time Defendant was receiving disability benefits, he was also receiving benefits under the United Airlines, Inc. Pilots' Fixed Benefit Retirement Income Plan ("the Retirement Plan") in the amount of $6,900.86. Additionally, the actuarial monthly payments that Defendant would have received had his United Air Lines, Inc. Pilots' Directed Account Retirement Income Plan ("PDAP") been annuitized were $7,997.01.

    5.      Pursuant to the terms of the controlling Plan document, Defendant was erroneously overpaid in the amount of $272,365.00 (minus a $10,805.41 tax credit). Thus, the Plan is entitled to recover $261,559.59 from Defendant.

## The Parties

    6.      At all times material herein, the Plan was and is an employee welfare benefit plan pursuant to ERISA and specifically 29 U.S.C. §1002(1). The claims administrator and fiduciary

for the Plan is United Air Lines, Inc. Retirement and Welfare Administration Committee ("RAWAC"). RAWAC is located in the County of Cook in Chicago, Illinois.

7.     At all times material herein, Defendant was and is a resident of Elgin, Illinois. Defendant was a pilot for United Air Lines, Inc. Defendant is a participant in the Plan pursuant to 29 U.S.C. §1002(7).

<strong>Statement of the Facts</strong>

8.     From 1995 to August 31, 2005, Defendant was receiving long-term disability benefits under the Plan.

9.     On November 1, 2002, Defendant elected to retire while receiving disability benefits. Under the Retirement Plan, he received $6,900.86 per month until August 31, 2005. Additionally, the actuarial monthly payments that Defendant would have received had his United Air Lines, Inc. Pilots' Directed Account Retirement Income Plan ("PDAP") been annuitized were $7,997.01.

10.     Section 5.4 of the Plan provides as follows:

> **Benefit Reductions**: If a Pilot voluntarily retires or is deemed to voluntarily retire in accordance with (i) the United Air Lines, Inc. Pilots' Fixed Benefit Retirement Income Plan (the "Fixed Plan") (including withdrawal of the Pilot's Contribution Account thereunder), or (ii) the December 16, 1992 Letter of Agreement between the Company and ALPA, then monthly Disability Income Benefits due under this Plan will be reduced (but not below zero) by:
>
> a. The monthly amount of the Pilot's Fixed Plan benefits actually paid to the Pilot (including the actuarial monthly equivalent of any Contributions Account lump sum withdrawn, but excluding the portion of such Contributions attributable to the Pilot's own actual contributions to the Fixed Plan and earnings attributable to such contributions under the Fixed Plan), and

3

b. The actuarial monthly equivalent of any distributions the Pilot could have received from Company contributions to the United Air Lines, Inc. Pilots' Directed Account Retirement Income Plan ("PDAP") and any earnings thereon, based on the highest PDAP account balance the Pilot attained after becoming Permanently Grounded, whether previously distributed from the PDAP or not.

*See* Exhibit B, the Plan.

11.     According to Section 5.4 of the Plan, a participant's disability benefit amount should be offset by certain retirement benefits, which include the two retirement benefits referenced above in paragraph 10. Thus, under the language of the Plan, Defendant has been overpaid.

12.     Plan Section 5.4 creates an equitable lien by agreement as to any overpayments received by a participant, such that said overpayments must be returned to the Plan.

13.     Under the terms of the Plan, Defendant owes the Plan $272,365 (less the tax credit $10,805.41), which comes to $261,559.59. The amount due is the result of a reduction of Defendant's long-term disability benefits by the amount he received from his pension benefits.

14.     The relevant time at issue is from November 1, 2002 to August 31, 2005 when Defendant was receiving approximately $8,011.00 per month from November 1, 2002 through November 20, 2004 and $8,010.00 per month from December 1, 2004 until August 31, 2005 in disability benefits and simultaneously receiving pension benefits.

15.     According to Section 5.4 of the Plan, Defendant's monthly disability benefit should have been offset by the sum of his Retirement Plan ($6,900.86) value and the monthly annuity value of his PDAP Plan ($7,997.01) for a total offset of $14,897.87.

16.     Since the offset ($14,897.87) to Defendant's monthly disability benefit was greater than his monthly disability benefit, his monthly benefit should have been reduced to zero.

4

17.    Defendant was notified of this overpayment in benefits and directed to repay the Plan the monies owed.

18.    Defendant refused to repay the monies owed to the Plan and instead appealed this determination. His appeals through the Plan appeal process were denied.

19.    Defendant has not yet repaid any of this overpayment to the Plan.

20.    Permitting Defendant to retain the overpayment of long-term disability benefits would result in a reduction of assets available to other Plan participants.

**COUNT I**
**(Enforcement of the ERISA Plan)**

21.    The allegations of Paragraphs 1 through 20 are incorporated herein by reference as if set forth fully in this Count I.

22.    Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), Plaintiff seeks recovery of funds from Defendant that are the result of an overpayment of long-term disability benefits by the Plan.

23.    As a result of the overpayment of long-term disability benefits, Defendant received $272,365.00 of excess benefits that he was not entitled to receive under the terms of the Plan and the Plan is entitled to recover $272,365.00 (less the tax credit $10,805.41), which comes to $261,559.59.

24.    Defendant has failed to repay the Plan the overpayment of long term disability benefits.

25.    By refusing to repay the Plan, Defendant has retained a benefit which belongs to the Plan, thereby enriching himself at the expense of the Plan and other Plan participants in bad faith and in violation of the Plan.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in its favor and against Defendant awarding the Plan the total amount of $261,559.59 pursuant to 29 U.S.C. §1132(a)(3), and awarding court costs and reasonable attorneys' fees pursuant to 29 U.S.C. §1132(g)(1).

## COUNT II
### (Federal Common Law of ERISA – Unjust Enrichment)

26.     The allegations of Paragraphs 1 through 20 are incorporated herein by reference as if set forth fully in this Count II.

27.     Plaintiff states a claim for unjust enrichment under the federal common law of ERISA pursuant to 28 U.S.C. §1331 or, in the alternative, 29 U.S.C. § 1367, and seeks reimbursement of funds that are the result of an overpayment of long-term disability benefits by the Plan.

28.     The Plan in good faith mistakenly overpaid Defendant in the amount of $272,365.00.

29.     The Plan has a reasonable expectation of repayment according to the terms of the Plan, specifically the offset provision.

30.     According to the terms of the Plan, Defendant should reasonably have expected to repay the Plan for any benefit overpayments resulting therefrom.

31.     The Plan is entitled to recover from Defendant $272,365.00 (less the tax credit $10,805.41), which comes to $261,559.59.

32.     By refusing to repay the Plan the $261,559.59 in long-term disability benefits, Defendant has had a benefit conferred upon him by the Plan, which belongs to the Plan and thereby unjustly enriched himself at the expense of the Plan and other Plan participants.

6

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in its favor and against Defendant awarding the Plan the total amount of $261,559.59, and awarding court costs and reasonable attorneys' fees pursuant to 29 U.S.C. §1132(g)(1).

Respectfully Submitted,

UNITED AIR LINES, INC. RETIREMENT AND
WELFARE ADMINISTRATION COMMITTEE

By: _____
       Attorney for the Plaintiff

Ronald J. Kramer
Frank A. Bear
Barbara H. Borowski
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
Phone: (312) 460-5000
Fax:  (312) 460-7000

7

# EXHIBIT A

## UNITED AIR LINES, INC.

### Consent of the Board of Directors in Lieu of Meeting

Pursuant to Section 141(0 of the Delaware General Corporation Law, the undersigned being all of the directors of United Air Lines, Inc,, ("United"), do hereby adopt the following resolutions by unanimous consent this date in lieu of a meeting of the Board of Directors:

### Creation of and Delegation to Retirement and Welfare Administration Committee

WHEREAS, United has established various welfare benefit plans and related trusts (the "Welfare Plans") and several individual account retirement plans and related trusts (the "401(k) Plans") subject to the Employee Retirement Income Security Act of 1974 ("ERISA") (collectively, the Welfare Plans and the 401(k) Plans are referred to as the "Plans"); and

WHEREAS, the Board of Directors of United has the authority under such Plans to amend the Plans; and

WHEREAS, United is the "plan administrator" (within the meaning of Section 3(16)(A) of ERISA) and is the "named fiduciary" (within the meaning of Section 402 of ERISA) of each of the Plans, with the authority to delegate to any person, persons or committee, responsibilities for the operation and administration of the Plans.

NOW, THEREFORE, BE IT RESOLVED, that United hereby establishes the Retirement and Welfare Administration Committee with the following committee members:

>        Marian M. Durkin
>        M. Lynn Hughitt
>        Peter B. Kain

FURTHER RESOLVED, that the Retirement and Welfare Administration Committee is hereby delegated all of the powers and duties of the Plan Administrator necessary or desirable for the management of the operations and administration of the Plans, subject to the requirements of such Plans, including any provisions governing committee membership and authority; and

FURTHER RESOLVED, that the Retirement and Welfare Administration Committee is hereby authorized to make any amendments to any of the Plans, as deemed necessary or desirable, which are administrative in nature or which will not have a material financial impact on United; and

FURTHER RESOLVED, that any member of the Retirement and Welfare Administration Committee is hereby authorized and directed to execute and deliver on behalf of United such instruments, including but not limited to the Plan documents or amendments, with such changes as they deem to be appropriate, as are required to carry out the intent of this Board of Directors or, the Retirement and Welfare

CHI 11276472.1 / 10550-000001

Administration Committee, as applicable, pursuant to resolutions relating to such Plans (the "Resolutions") or as are required by law or collective bargaining agreements, in form satisfactory to the General Counsel of this Corporation; and

FURTHER RESOLVED, that any of the officers of United are hereby authorized to take such action or actions as may be considered necessary, advisable, or desirable to carry out the purpose and intent of the Resolutions and to effectuate, implement and supplement them; and

FURTHER RESOLVED that for the sake of convenience, this Written Consent Action may be executed in two or more counterparts, which together shall constitute one instrument.

Dated: September 24, 2004

_____
Frederic F. Brace

_____
Douglas A. Hacker

_____
Peter D. McDonald

_____
John P. Tague

_____
Glenn F. Tilton

2

**UNITED AIR LINES, INC.**
**Consent of Directors in Lieu of Meeting**

Pursuant to Section 141(f) of the Delaware General Corporation Law, the undersigned,

being all of the directors of United Air Lines, Inc. ("United"), do hereby adopt the following

resolutions by unanimous consent this date in lieu of a meeting of the Board of Directors:

> WHEREAS, the Board of Directors of United by resolutions adopted January 30, 1986 delegated certain duties and responsibilities to the Pension and Welfare Plans Administrative Committee ("PAWPAC"); and

> WHEREAS, PAWPAC is the named fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") for the pension and welfare benefit plans sponsored by United ("ERISA Plans"); and

> WHEREAS, all members of PAWPAC have submitted their resignations effective June 28, 2004, and the Board of Directors has determined not to appoint successor members to PAWPAC, to revoke the delegation of the duties and responsibilities of PAWPAC, and to name United as the named fiduciary for purposes of the ERISA Plans.

> NOW, THEREFORE, BE IT RESOLVED, that effective June 28, 2004, the Board of Directors hereby revokes the delegation of duties and responsibilities assigned to PAWPAC for the ERISA Plans by resolutions adopted January 30, 1986;

> FURTHER RESOLVED, that effective June 28, 2004, United shall be designated as the named fiduciary for purposes of ERISA and that the duties and responsibilities of United with respect to the ERISA Plans are as follows:

> 1) To administer the ERISA Plans in accordance with applicable laws and to develop written policies and procedures governing the administration of • the ERISA Plans;

> 2) To submit to this Board for approval any amendments to existing ERISA Plans or any proposals to create new ERISA Plans;

> 3) To submit periodic reports to this Board reflecting the status and financial conditions of the ERISA Plans;

> 4) To submit for prior approval by this Board all trustee appointments to ERISA Plan trusts;

> 5) To review periodically the performance of fiduciaries who exercise any authority or control respecting the management or disposition of plan assets of ERISA Pension Plans, to appoint or remove such fiduciaries, and to report to this Board with respect thereto;

6)     To develop and/or review the funding policy for ERISA Pension Plans and to make recommendations to this Board as and when appropriate with respect thereto;

7)     To establish procedures providing for the periodic audit of the administration and operation of the ERISA Plans by independent outside consultants or auditors, who shall report their findings directly to this Board.

FURTHER RESOLVED, that United hereby is, to the extent permitted by law, authorized to delegate to others the duties and responsibilities assigned herein to United by this Board;

FURTHER RESOLVED, that United shall cause to be prepared and shall submit annually to this Board a report setting forth in such detail as the Board may request:

(1)     the measures adopted and the actions taken by United to carry out the policy of this Corporation as stated in these resolutions with respect to ERISA Plans;

(2)     a description of the activities of United with respect to the ERISA Plans; and

(3)     such other matters of information as the Board shall determine to be necessary and appropriate to its function.

Dated: July 16, 2004

_____
Frederic F. Brace

_____
Douglas A. Hacker

_____
Peter D. McDonald

_____
John P. Tague

_____
Glenn F. Tilton

2

# EXHIBIT B

5-1-94
Di

UNITED AIR LINES, INC.

PILOT DISABILITY INCOME PLAN

CONTENTS

PAGE

    I.  INTRODUCTION . . . . . . . . . . . . . . . . 1

   II.  DEFINITIONS . . . . . . . . . . . . . . . . . 1

  III.  COMMENCEMENT OF COVERAGE . . . . . . . . . . . 3

   IV.  COMMENCEMENT OF DISABILITY INCOME BENEFITS . . . 3

    V.  AMOUNT OF DISABILITY INCOME BENEFITS . . . . . . 3

   VI.  TERMINATION OF DISABILITY INCOME BENEFITS . . . . 4

  VII.  TERMINATION OF COVERAGE . . . . . . . . . . . . 5

 VIII.  PLAN ADMINISTRATION . . . . . . . . . . . . . . 5

   IX.  AMENDMENT AND TERMINATION . . . . . . . . . . . 6

    X.  GENERAL PROVISIONS . . . . . . . . . . . . . . 7

UNITED AIR LINES, INC.

PILOT DISABILITY INCOME PLAN

WHEREAS, United Air Lines, Inc. (the "Company") desires to continue to provide disability income benefits for its eligible Pilot and Flight Management employees as it has before May 1, 1994; and

WHEREAS, the Company desires to replace the disability income insurance coverage previously offered before May 1, 1994 by Connecticut General Life Insurance Company ("Connecticut General") under Policy Number 0221305-16 with a self-funded plan meeting the requirements of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and funded by a voluntary employees' beneficiary association ("VEBA") trust qualified under §§501(a), 501(c)(9), 419, and 419A of the Internal Revenue Code of 1986 (the "Code");

NOW, THEREFORE, effective as of May 1, 1994, the Company hereby adopts this United Air Lines, Inc. Pilot Disability Income Plan (the "Plan").

## I.  INTRODUCTION

1.1.  Welfare Plan.  The Plan is a welfare benefit plan as defined in ERISA §3(1) and forms a part of the United Air Lines, Inc. Employee Welfare Benefit Plan (the "Welfare Plan").

1.2.  VEBA Funding.  The Plan is funded by the United Air Lines, Inc. Pilot Disability Income VEBA Trust (the "Trust"), which forms a part of the Plan, but in the Company's discretion may also be funded from the Company's general assets, provided that doing so does not violate ERISA or the Code.

1.3.  Effective Date.  Notwithstanding anything else to the contrary in this Plan, this Plan will pay disability income benefits only to Pilots who are newly declared to be Permanently Grounded (and are otherwise eligible for disability income benefits) on or after May 1, 1994.  Pilots who were newly declared to be Permanently Grounded (and are otherwise eligible for insurance) before May 1, 1994 will continue to be covered by and receive disability income benefits from Connecticut General under Policy Number 0221305-16.

## II.  DEFINITIONS

2.1.  Active Pilot Status.  A Pilot will be considered on Active Pilot Status only when he is physically qualified and on flight status.

2.2.  Active Service.  A Pilot will be considered in Active Service if he is on Company records as being on Active Pilot Status on a regular full-time basis.

2.3.  ALPA.  The term ALPA means the Air Line Pilots Association, International or the Air Line Pilots in the Service of United Air Lines, Inc.

2.4.  CRAF.  The term CRAF means Civil Reserve Air Fleet.

2.5.  Disability Income Benefits.  The term Disability Income Benefits means the long term disability benefits payable under the Plan.

2.6.  Injury.  The term Injury includes all bodily injuries received by an individual in any one accident.

2.7.  MAC.  The term MAC means Military Airlift Command.

2.8.  Monthly Earnings.  The term Monthly Earnings means the monthly arithmetic average of the Pilot's highest annual earnings, based on:

a.  A Pilot's highest annual earnings is the greater of:

(i)  his highest calendar year of earnings in any of the five calendar years before the calendar year during which he is Permanently Grounded, or

(ii)  his actual earnings during the 12 consecutive calendar months immediately before the date on which he is Permanently Grounded.

b.  If, during the 12 consecutive calendar month period specified in item a.(ii) above, (i) a Pilot was on extended sick leave at less than full earnings, (ii) a non-pilot work stoppage resulted in a loss of earnings to the Pilot, or (iii) the Pilot's paid sick leave was exhausted, then any such month or months during any portion of which such conditions existed will be excluded from the 12 consecutive month period, and the Pilot's highest annual earnings will be computed using only the remaining months, if any, during the 12 consecutive month period.

c.  Computations of earnings (i) will be based on the Company's payroll records, (ii) will be based on the month in which they were paid rather than the month in which they were earned, and (iii) will be based on earnings for services rendered to the Company as a Pilot.

d.  After the effective date of the reduction in earnings levels agreed to by the Company and ALPA in connection with the purchase by certain Company employees of a majority of the voting stock of UAL Corporation through an employee stock ownership plan, a Pilot's earnings for any month will be based on the earnings specified in letter agreement 94-4 between the Company and ALPA.

2.9  PAWPAC.  The term PAWPAC means the United Air Lines, Inc. Pension and Welfare Plans Administration Committee, as appointed from time to time by the Company's Board of Directors.

2.10.  Permanently Grounded.  A Pilot is Permanently Grounded on the first date that all of the following conditions are satisfied:

a.  The Company's Corporate Medical Director has determined that the Pilot is permanently unable for medical reasons (other than those listed in items

(i) through (vi) below) to pass the periodic physical examinations required by the Company of all Pilots:

(i) Intentionally self-inflicted injury,
(ii) Attempted suicide,
(iii) Alcohol addiction,
(iv) Drug addiction,
(v) Injury suffered or incurred while engaged in or resulting from having engaged in a criminal enterprise, and
(vi) Disability resulting from war or active duty in the armed forces other than while participating in a MAC or CRAF operation or military duty while actively employed by the Company;

b. The Pilot has exhausted all of his paid sick leave; and

c. The Pilot has exhausted all of his paid vacation days.

2.11. <u>Pilot</u>. The term Pilot means an employee of the Company who is classified on a permanent basis by the Company as a Pilot or a Flight Management Employee.

## III.   COMMENCEMENT OF COVERAGE

3.1. <u>Coverage Effective</u>. Each Pilot will become covered for Disability Income Benefits on the date he has completed one year of Active Service as a Pilot with the Company.

3.2. <u>Pilot Not in Active Service</u>. If a Pilot is not in Active Service on the date his coverage would otherwise become effective, it will become effective on the date he returns to Active Service.

3.3. <u>Employees Outside of U.S.</u> Any employee of the Company working outside of the United States is not eligible for coverage for Disability Income Benefits unless he is a Pilot covered by a U.S. collective bargaining agreement.

## IV.   COMMENCEMENT OF DISABILITY INCOME BENEFITS

4.1. <u>Benefit Entitlement</u>. If a Pilot, while covered under this Plan, becomes Permanently Grounded, the Plan will pay monthly Disability Income Benefits for the period during which the Pilot remains Permanently Grounded.

4.2. <u>Benefit Commencement</u>. Disability Income Benefits will commence on the day following the date the Pilot is terminated from employment by the Company because of his Permanent Grounding.

## V.   AMOUNT OF DISABILITY INCOME BENEFITS

5.1. <u>Benefit Amount</u>. Monthly Disability Income Benefits under the Plan are an amount equal to 55% of the Pilot's Monthly Earnings, subject to section 5.4 below.

- 3 -

5.2.  <u>Payment Frequency</u>.  Monthly Disability Income Benefits will be paid on a calendar month basis and will be prorated on a daily basis for any partial calendar months for which they are due.

5.3.  <u>Daily Proration</u>.  Daily Disability Income Benefits will be 1/30th of the amount of monthly Disability Income Benefits.

5.4.  <u>Benefit Reductions</u>.  If a Pilot voluntarily retires or is deemed to voluntarily retire in accordance with (i) the United Air Lines, Inc. Pilots' Fixed Benefit Retirement Income Plan (the "Fixed Plan") (including the withdrawal of the Pilot's Contribution Account thereunder), or (ii) the December 16, 1992 Letter of Agreement between the Company and ALPA, then monthly Disability Income Benefits due under this Plan will be reduced (but not below zero) by:

a.  The monthly amount of the Pilots' Fixed Plan benefits actually paid to the Pilot (including the actuarial monthly equivalent of any Contribution Account lump sum withdrawn, but excluding the portion of such Contribution Account attributable to the Pilot's own actual contributions to the Fixed Plan and any earnings attributable to such contributions under the Fixed Plan), and

b.  The actuarial monthly equivalent of any distributions the Pilot could have received from Company contributions to the United Air Lines, Inc. Pilots' Directed Account Retirement Income Plan ("PDAP") and any earnings thereon, based on the highest PDAP account balance the Pilot attained after becoming Permanently Grounded, whether previously distributed from PDAP or not.

Fixed Plan or PDAP benefits payable under Code §401(a)(9) on account of a Pilot's attainment of age 70½ will not be deemed to be paid on account of voluntary retirement.

## VI.  TERMINATION OF DISABILITY INCOME BENEFITS

6.1.  <u>Age 60 or Fifth Year</u>.  Disability Income Benefits will not be payable for any period after the later of:

a.  The Pilot's 60th birthday, or

b.  The fifth year anniversary of the date the Pilot was Permanently Grounded.

6.2.  <u>Recovery from Permanent Grounding</u>.  Disability Income Benefits will not be payable after a Pilot ceases to be Permanently Grounded.

6.3.  <u>Pilot's Death</u>.  Disability Income Benefits will not be payable after the death of a Pilot, except that a Pilot's surviving spouse will be paid or may retain (in the case of a monthly Disability Income Benefit already paid) the monthly Disability Income Benefit payment for the month in which the Pilot dies, without proration for any days in the month after such death.

6.4.  <u>Reemployment as a Pilot</u>.  Disability Income Benefits will not be payable after a Pilot is re-employed with the Company as a Pilot.

- 4 -

## VII.  TERMINATION OF COVERAGE

7.1.  <u>Coverage Ends</u>.  A Pilot's coverage under the Plan will automatically terminate on the earliest of the following dates:

    a.  the date the Pilot ceases to qualify as a Pilot;

    b.  the last day of the period for which the Pilot has made the required contribution, if any, toward the cost of the Plan's coverage;

    c.  the date the Plan is discontinued;

    d.  the date the Pilot notifies the Company to discontinue his coverage under the Plan (or, if later, the effective date of such notice); or

    e.  the date of the Pilot's termination of Active Service.

7.2.  <u>Benefits Continue</u>.  A Pilot's termination of coverage under items 7.1.a. or e. above will not cause any Disability Income Benefits that the Pilot previously qualified for to terminate.  Those benefits will terminate as provided in section VI. above.

7.3.  <u>Medical Leave</u>.  If a Pilot's Active Service terminates because the Pilot is on an approved medical leave, his coverage under the Plan will be continued during the Pilot's approved medical leave.

7.4.  <u>Work Stoppages</u>.  If a non-striking Pilot's Active Service terminates because of a work stoppage by striking employees, coverage under the Plan will continue during the work stoppage period.  The Company will determine whether a Pilot is a striking employee or a non-striking employee.

## VIII.  PLAN ADMINISTRATION

8.1.  <u>Appointment</u>.  In accordance with the terms of the Welfare Plan of which this Plan is a part, the Plan will be administered by PAWPAC, except as otherwise indicated herein.  PAWPAC will be the "named fiduciary" for the Plan as described in ERISA §402(a)(2) and will be the Plan's "administrator" as described in ERISA §3(16)(A).  If any other person or entity is designated as named fiduciary or plan administrator under the Welfare Plan, then that person or entity will be substituted for PAWPAC as named fiduciary or plan administrator, as the case may be, for this Plan.

8.2.  <u>Powers and Duties</u>.  PAWPAC will have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following:

    a.  to control and manage the operation and administration of the Plan and to delegate in writing such functions to others in accordance with the applicable provisions of ERISA;

    b.  to construe and interpret the Plan, decide all questions of eligibility, and determine the amount, manner, and time of payment of any benefits hereunder.

   c.  to prescribe procedures to be followed by Pilots or beneficiaries filing applications for benefits;

   d.  to prepare and distribute, in such manner as it determines to be appropriate, information explaining the Plan;

   e.  to receive from the Company and from Pilots and their beneficiaries such information as may be necessary for the proper administration of the Plan; and

   f.  to appoint or employ individuals to assist in the administration of the Plan and any other agents it deems advisable, including legal and actuarial counsel.

8.3.  <u>Rules and Decisions</u>.  PAWPAC may adopt such rules as it deems necessary, desirable, or appropriate.  All rules and decisions of PAWPAC will be uniformly and consistently applied to all Pilots and beneficiaries in similar circumstances.  When making a determination or calculation, PAWPAC will be entitled to rely upon information furnished by a Pilot, a Pilot's beneficiary, the Company, or the legal counsel of the Company.

8.4.  <u>Exercise of PAWPAC's Duties</u>.  Notwithstanding any other provisions of the Plan, PAWPAC will discharge its duties hereunder solely in the interests of Pilots covered by the Plan and their beneficiaries, and

   a.  For the exclusive purpose of:

     (i)  providing benefits to Pilots and other persons entitled to benefits under the Plan; and

     (ii) defraying reasonable expenses of administering the Plan; and

   b.  With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

8.5.  <u>Liability</u>.  No member of PAWPAC and no officer or employee of the Company will be liable to any person for any action taken or omitted in connection with the administration of this Plan unless attributable to his own fraud or willful misconduct.

## IX.   AMENDMENT AND TERMINATION

9.1.  <u>Amendment and Termination</u>.  Although the Company intends to continue the Plan indefinitely, it reserves the right to amend or terminate the Plan in its discretion by written instrument adopted or authorized by its Board of Directors or any officer or person authorized by its Board of Directors.  Any such amendment or termination may be part of or independent of an amendment or termination of the Welfare Plan of which this Plan is a part.  Any amendment of the Plan may be made retroactively, provided that it does not adversely affect a Pilot or Pilot's beneficiary under the Plan.

9.2. <u>Cessation of Funding</u>. The Company has established the Plan with the bona-fide intention and expectation that it will continuously fund the Plan in accordance with the Trust, or directly from its general assets, in amounts sufficient to pay all Disability Income Benefits due hereunder. If, however, the Company decides, in the manner specified in section 9.1. above, that it is impossible or inadvisable for it to continue to make such contributions, the Company may cease such funding. If the Company voluntarily or involuntarily and permanently ceases such funding, with or without formal action by the Company, then the Plan will remain in existence to pay benefits hereunder until all Plan assets have been paid out.

9.3. <u>No Reversion</u>. No part of the corpus or income of the Plan will revert to the Company or be used for, or diverted to, purposes other than for the exclusive benefit of Pilots or other persons entitled to benefits under the Plan, except as otherwise permitted under ERISA and the Code; provided, however, that the foregoing will not prevent the payment of Plan assets to the Company to reimburse the Company for Plan benefits advanced to Pilots or beneficiaries on behalf of the Plan; and provided further that if the Company makes any contribution, or portion thereof, because of a mistake of fact, such contribution, or portion thereof, will be deemed not to have been contributed to the Plan and will be returned to the Company within one year after payment to the Plan. If assets remain in the Plan after termination of the Plan and after the payment of all Plan benefits, then such remaining assets will be used to provide other benefits due under the Welfare Plan.

## X.  GENERAL PROVISIONS

10.1. <u>Notice of Permanent Grounding</u>. Disability Income Benefits will not be due under the Plan unless a Pilot, his representative, or the Company's Corporate Medical Director gives a written notice of the Pilot's Permanent Grounding in accordance with section 2.10 to PAWPAC or its designee.

10.2. <u>Filing a Claim Form</u>. PAWPAC or its designee, when it receives the notice of the Permanent Grounding, will furnish a claim form to the Pilot or his representative. The completed claim form must be filed with PAWPAC or its designee within 90 days after the date the form was received. Failure to file a claim form within the time provided in this section will neither invalidate nor reduce any claim if it is shown that it was not reasonably possible to file it within that time and that it was filed as soon as was reasonably possible.

10.3. <u>Medical Examinations</u>. The Company or PAWPAC, at its own expense, will have the right and opportunity to have any Pilot for whom a claim is pending or being paid under this Plan examined by a physician or other appropriate medical practitioner when and so often as it may reasonably require.

10.4. <u>Benefits Payable</u>. Disability Income Benefits due under section IV. and all other applicable provisions of the Plan will be payable to a Pilot as soon as practicable after a claim form is filed. When paid, Disability Income Benefits will commence retroactively to the date the Pilot was newly declared Permanently Grounded.

10.5. <u>Incompetence</u>. If a Pilot, in the opinion of PAWPAC, is not competent to give a valid receipt for the payment of any benefit due to him under this Plan, the

Plan will pay Disability Income Benefits only to a duly appointed guardian or other legally appointed representative of the Pilot. Any payment in accordance with this section will discharge the Plan from all further liability to the extent of the payment made.

10.6. <u>Limitations on Actions</u>. No action at law or in equity will be brought to recover under the Plan before the expiration of 60 days after a claim form has been filed in accordance with the requirements of section 10.2. of the Plan, nor will any action be brought at all unless brought within three years from the expiration of the time within which the filing of a claim form is required by the Plan.

IN WITNESS WHEREOF, the Company has caused this Plan to be adopted, put into effect in accordance with its terms, and executed as of the date first above specified.

UNITED AIR LINES, INC.

By: _____

John C. Pope
President and
Chief Operating Officer